IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| LEO A. ZIMMER, | ) | CASE NO. 1:19-cv-01412 |
| | ) | |
| Petitioner, | ) | JUDGE DAN AARON POLSTER |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| WARDEN NEIL TURNER, | ) | |
| | ) | |
| Respondent. | ) | **REPORT & RECOMMENDATION** |

On June 11, 2019,[1] *pro se* Petitioner Leo A. Zimmer ("Petitioner" or "Zimmer") filed a

Petition for Habeas Corpus pursuant to 28 U.S.C. § 2254 ("Petition").  Doc. 1.  Zimmer

challenges the constitutionality of his conviction and sentence in *State of Ohio v. Leo A. Zimmer*,

Case No. CR-16-602862 (Cuyahoga County).  Doc. 1.  Following a bench trial, the court found

Zimmer guilty of various sexual and kidnapping offenses involving minors.  Doc. 6-1, p. 92.

The trial court sentenced Zimmer to life in prison for the two counts of rape of a child under age

13; ten years in prison each for each of the three counts of forcible rape; ten years in prison for

the kidnapping associated with the GSI.  Doc. 6-1, pp. 39-40, 92-93.  The trial court merged the

other kidnapping convictions into the associated rape convictions; merged the gross sexual

imposition into the associated kidnapping conviction; and ordered all the sentences to be served

concurrently.  Doc. 6-1, pp. 92-93.

---

[1] "Under the mailbox rule, a habeas petition is deemed filed when the prisoner gives the petition to prison officials for filing in the federal courts." *Cook v. Stegall,* 295 F.3d 517, 521 (6th Cir. 2002) (citing *Houston v. Lack,* 487 U.S. 266, 273 (1988)).  In his Petition, Zimmer declares that he placed his Petition in the prison mailing system on June 11, 2019.  Doc. 1, p. 15.  Zimmer's Petition was docketed in this Court on June 19, 2019.  Doc. 1.

This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.  Pending before this Court is Respondent's Motion to Dismiss filed on September 3, 2019.  Doc. 6.  Zimmer filed a response on October 15, 2019 (Doc. 7), and, on October 18, 2019, Respondent filed a reply (Doc. 8).

For the reasons set forth below, the undersigned concludes that Zimmer's Petition is untimely under 28 U.S.C. § 2244(d).  Further, Zimmer has not demonstrated an entitlement to equitable tolling of the statute of limitations.  Accordingly, the undersigned recommends that the Court **GRANT** Respondent's Motion to Dismiss (Doc. 6) and **DISMISS** Zimmer's Petition (Doc. 1).

## I.  Factual Background

In a habeas corpus proceeding instituted by a person in custody pursuant to the judgment of a state court, the state court's factual findings are presumed correct.  The petitioner has the burden of rebutting that presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *see also Railey v. Webb*, 540 F. 3d 393, 397 (6th Cir. 2008) *cert. denied,* 129 S. Ct. 2878 (2009).  The Eighth District Court of Appeals summarized the facts underlying Zimmer's conviction as follows:

> {¶ 12} A.C. first met Zimmer when she was about five years old. A.C. spent "a lot of time" at the Pershing house, because A.C.'s aunt was dating Zimmer. From the time she was in second grade to the time she was in ninth grade, A.C. and her mom lived with Zimmer and A.C.'s aunt in the Pershing house. According to A.C., other people also lived there, including Zimmer's parents, Zimmer's siblings and their spouses, and A.B., who is Zimmer's great-niece.

> {¶ 13} A.C. did not specifically remember the first time that Zimmer touched her inappropriately, but she testified that "I have certain memories of me sitting on his lap, and if I were to have a dress on or a skirt, his hand reaching up and just touching inappropriately in ways, and * * * just fondling through, like, my clothes or under my dresses if I were to be close to him or sitting on his lap."

{¶ 14} A.C. recalled a specific incident that occurred at the home of Zimmer's cousin[1] when A.C. was "about" in the second grade. "I was supposed to be sleeping on the couch with my cousin in the living room while I believe [the adults] were playing cards in the dining room, slash, kitchen. And [Zimmer] came to check on us, and we weren't sleeping yet. And I do remember him putting his hand in my pants that night. * * * He played on the outside of my vagina."

> [FN 1 – This is the only evidence of abuse that took place outside of the Pershing house.]

* * *

{¶ 21} A.C. testified that eventually Zimmer's abuse escalated from inappropriate touching to penetration and occurred "[i]n the bedroom or on the couch, depending on where anybody else in the house was * * *." A.C. testified about "being in a bedroom, in a nightgown, under the blankets, watching a movie, and it was right after a bath. My mother was not home. * * * And I remember him coming into the room and playing around on the bed. And I remember being under the blanket and him going up under my nightgown and penetrating my vagina" with his hands. A.C. believes she was "either seven or eight years old" when this happened.

{¶ 22} A.C. also testified that Zimmer took her virginity when she was 13 years old. According to A.C., Zimmer "climbed into the bed with me, and he reeked of alcohol. And then he took my pants off, and he penetrated my vagina with his mouth, and then climbed on top of me and proceeded to penetrate me with his penis. He stuck it inside of me for—I don't remember how long it lasted, but I know it didn't last very long."

{¶ 23} A.C. testified that she did not say anything or try to stop Zimmer because she was "kind of frozen" when it happened.

{¶ 24} A.C. testified that when she was 13 or 14 years old, she told her boyfriend that Zimmer took her virginity. Additionally, when A.C. was 14 years old, she wrote a letter to her mother telling her what Zimmer had done. A.C.'s mother did not talk to A.C. for two days before they had a face-to-face conversation about the abuse. A.C. testified that she wanted Zimmer out of her life and she wanted "to forget about it." Neither A.C. nor her mother reported the allegations to anyone. According to A.C., her mother's reaction—or lack thereof—resulted in A.C. not going to the authorities to report the abuse. "Her not speaking to me for two days, I think that played a big part in me not going to anybody else. I didn't want to see what anybody else's reaction would be."

{¶ 25} A.B. also testified for the state about her allegations against Zimmer. A.B. testified that she would spend "almost every weekend" and part of the summers at the Pershing house from when she was in the third or fourth grade until she was 15 or 16 years old. Zimmer, who is A.B.'s great uncle, was living in the house. A.B.

spent a lot of time with A.C., who was also living there. Eventually the girls referred to each other as "cousin."

{¶ 26} A.B. testified that she was in the fourth or fifth grade when Zimmer first inappropriately touched her. "I remember that my mom dropped me off there to go Christmas shopping or something one time, and we were watching a movie on the couch * * *. And I don't remember the movie. But I remember that [Zimmer] got a blanket, and then he started touching me on my vagina, and then he put his penis inside of me."

{¶ 27} A.B. testified that although "[e]verything kinda meshes together," she recalled another specific incident of Zimmer molesting her when she was in the fourth or fifth grade. A.B. was laying on a "roll out bed" under "white hospital blankets." A.B.'s sister and A.C. were on the couch, and the three girls were watching a movie. "And [Zimmer] came over and sat next to me and started touching me with his fingers inside my vagina * * * [u]nderneath the blanket."

{¶ 28} A.B. testified that on another occasion when she was in the sixth grade, Zimmer "was wrapping Christmas presents in the attic at the Pershing house. And I went upstairs, and he put me onto his lap and started kissing me, and then he started touching me up there [and] through my pants." A.B. recalled another incident that happened in the upstairs unit of the house, where Zimmer's father—who is A.B.'s great-grandfather—lived. Zimmer, A.B., and the great-grandfather were in the living room watching TV. Zimmer and A.B. were on the couch under a blanket, and Zimmer put his fingers inside A.B.'s vagina. "I just remember [Zimmer] and great grandpa looking at each other, and I felt like great grandpa knew what was going on."

{¶ 29} A.B. further testified that Zimmer stopped abusing her when she was in the eighth grade, because she "stopped hanging around the house so much." A.B. testified that she did not want these things to happen, but she did not tell Zimmer to stop because "he was older than me, an adult. * * * I pretended like it never happened." A.B. further testified that she was scared, but she got "used to it." Asked what she was scared of, A.B. answered: "If I wanted him to stop and he didn't. Because it could have been more forceful if I would have said no."

{¶ 30} Both victims testified consistently about when they eventually reported the sexual abuse. On December 14, 2015, A.B. told A.C. via text messages that Zimmer was dating a woman named Shawna, who had previously been married to A.B.'s uncle. Shawna and A.B.'s uncle had children together, and A.B. was concerned about the possibility of those children being abused by Zimmer. A.C. testified that this information made her "very sad and * * * very nervous because I had a feeling of what I was going to have to do to make that feeling * * * in my stomach go away * * *." According to A.C., their main goal was about "protecting the kids."

{¶ 31} The text messages between the two victims, which were introduced at trial, follow:

> A.B. Dude Leo is dating Shawna my uncles ex and she has 3 girls including my cousin * * *. What can we do to prevent anything from happening to them. * * *

> A.C. Oh my god. I'm gonna have a panic attack.

> A.B. Be careful with your thoughts and words. Let's not manifest anything. Let's just figure out the best way to save them together. [My sister] told me 2 days ago and I've thought about it a little but I just seen him post pics of all them on his [Facebook page].

> A.C. [O]kay. Your right. But I know what's gonna happen. I can't let [it] happen.

> A.B. We will stop it from happening. * * * My [other] uncle * * * is in Columbus. He told my mom he would try and get them but basically he gave up on being a dad. And now his kid[s'] mom is with that. * * *

> A.C. I'll do whatever I can. Tell your uncle what Leo did to us. We have to get involved to save them. I'm gonna be sick dude. I've had a bad feeling the past 2 days. M[y] chest has been heavy like something bad was gonna happen and now it makes sens[e]. * * *

> A.B. * * * Do we get the courts involved, like how do we go about this? My uncle is not rational, and he's not very smart.

> A.C. * * * I think the courts should be involved. I'm scared.

> A.B. * * * I'm scared too. * * * They are all so crazy. We can't let that happen. Can we like call anonymous to social services? Do we put him in jail and go to the courts. [I don't know] what to do or who to ask advice from about this. * * * But there's kids involved now. I can't live knowing I didn't do anything to protect them.

> A.C. We can't be [anonymous] if we're the prime witnesses. I'm gonna talk to someone tomorrow about it. See what we can do.

> A.B. Okay. I'm hoping some solution comes to me in my dreams. Let's stay connected tonight so we can figure it out together. I'm sorry I wasn't there for you when this happened to you. I'm sorry I didn't tell anybody sooner to protect you.

A.C. Do you work tomorrow and what time. I'm off all day. * * * I'm scared * * *. My chest has been so heavy and now it's worse. I don't like this. We have to save them. I love you.

{¶ 32} A.C. and A.B. went to the Cleveland police station later that day and filed a report.

{¶ 33} Asked why she and A.C. reported Zimmer's abuse in December 2015, A.B. testified, "Because I felt now is the time that we need to go to the authorities about what happened to us to protect the kids." A.B.'s testimony continued as follows: I found out that Zimmer was dating * * * my uncle's ex-wife * * *. And then a couple days later, a couple nights later I was on Facebook, and I saw that there were pictures with [Zimmer's girlfriend's] children on Facebook, Christmas pictures downtown. * * * I tried to avoid thinking about what could possibly be happening to those children. And when I saw the pictures, it just kinda hit me. And I texted [A.C.] and told her what I knew, and we made the decision to go forward and go to the authorities.

{¶ 34} A.B. testified that she was sexually abused by two other men and she reported both of them to the authorities. However, she did not mention Zimmer abusing her during either of these investigations. Additionally, A.B. testified that, subsequent to the abuse, she saw Zimmer on a few social occasions but still did not report any of the incidents to the authorities or another adult.

{¶ 35} Asked to explain why her trial testimony was more detailed than the report she previously gave to the police, A.B. stated as follows:

> I spent my whole life pretending like this never happened. And when I made the—I don't want to say rash, but maybe rash decision to come to the authorities about what happened, I never fully collected all of my thoughts. We just kinda did it, you know, I just told people what happened. And over time I started opening up different parts of my brain and digging deeper into my subconscious to pull out different memories. * * * I grabbed a notebook, and I just started writing different things to take myself back there.

{¶ 36} A.B. also sent an email to the detective prior to trial: "I'm sorry that I couldn't have gotten these memories together beforehand, and I had to dig deep into my subconscious to find them. And it was really hard because I'm trying not to drive myself crazy with them, memories of what happened."

{¶ 37} A.C.'s ex-boyfriend testified that the two dated when A.C. was 13 to 16 years old. He testified that he no longer had any contact with A.C., he did not like A.C., and he was "extremely pissed" that he had to testify. Nonetheless, the ex-boyfriend stated that in 2009, when they were dating, A.C. told him she lost her

virginity to Zimmer when Zimmer raped her. This testimony corroborates A.C.'s testimony.

{¶ 38} Lillian, who is A.C.'s mom, testified that in 2010, she received a letter from her daughter A.C., when A.C. was 14 years old, accusing Zimmer of inappropriately touching her and A.B. when they had spent the night at the Pershing house in the past. This corroborates A.C.'s testimony. According to Lillian, A.C. did not want to talk about the details nor did she want to report the abuse to the authorities. Lillian took A.C. to a counselor. "I did my best to get her to open up to me, and she was not comfortable talking to me. And I thought that maybe a professional would be better * * *." However, A.C. "only went to a few sessions" then "made a decision not to go any further."

{¶ 39} Lillian testified that she did not know about this trial until the state called her the night before her testimony. She was caught off guard and told them what she could; however, she did not think to tell them over the phone that A.C. saw a counselor. According to Lillian, this is why the counseling was brought up for the first time during her testimony.

{¶ 40} Cleveland Police Detective Richard Durst testified that he interviewed A.C. and A.B. on the same day, but separately. According to Durst, during his seven years as a detective in the sex crimes unit, he has experience with cases involving "delayed disclosure" of abuse of minor children. Asked how common this is, Durst replied, "I would say it's a third of my case load." Detective Durst testified that both A.C. and A.B. stated they decided to come forward with the allegations after seeing pictures on Facebook of Zimmer with his girlfriend's small children.

{¶ 41} Durst was asked if he interviewed J.B., who is A.B.'s sister, and he said, "No." Durst testified that he first learned that A.C. allegedly went to a counselor about being molested by Zimmer during Zimmer's trial. He also testified that, by law, if felony sexual abuse had been reported to a counselor, that counselor would be obligated to turn the information over to the authorities.

{¶ 42} Shawna Kerns, who testified for the defense, stated that she is currently dating Zimmer, but used to be married to Zimmer's nephew. Kerns is an aunt to A.B. and a family friend to A.C. Kerns was close with both girls when they were living and/or staying at the Pershing house; however, their relationships deteriorated by 2010 after Kerns's divorce. Her four kids are in the Cuyahoga County Department of Children and Family Services system relating to domestic abuse by Kerns's ex-boyfriend. Zimmer currently watches her kids at times when she is working, and Kerns told the social worker about the allegations against Zimmer. The social worker interviewed Kerns's four children, but the county did not take any action as a result of the interviews.

{¶ 43} Zimmer's mother and sister also testified on behalf of the defense. They both testified that they have lived in the upstairs part of the Pershing house since

the 1970s. They also testified about the various times they saw A.B. and A.C. over the years at the Pershing house and family functions, but that neither A.B. nor A.C. ever mentioned that Zimmer sexually abused them.

*State v. Zimmer*, 2017-Ohio-4440, ¶¶ 12-14, 21-43, 2017 WL 2691323, at ** 2-7; Doc. 6-1, pp. 94-95, 98-106 (alterations in original).

## II.    Procedural Background

### A.    State Conviction

On February 9, 2016, a Cuyahoga County Grand Jury indicted Zimmer on 12 counts: two counts of rape of a victim under the age of thirteen (R.C. 2907.02(A)(1)(b))(Counts 1, 9); five counts of kidnapping, three of a victim under the age of thirteen, one of victim under the age of eighteen (R.C. 2905.01(A)(4)) (Counts 2, 6, 8, 10 and 12); four counts of rape (R.C. 2907.02(A)(2)) (Counts 3, 4, 5 and 11); and one count of gross sexual imposition ("GSI") in which the victim is under the age of thirteen (R.C. 2907.05(A)(4))(Count 7).   Doc. 6-1, pp. 5-16. All counts carried a sexually violent predator specification and all counts but the GSI carried a repeat violent predator specification.  *Id.*  The kidnapping counts carried a sexual motivation specification and certain rape and kidnapping counts (Counts 3, 4, 5, 6, 8, 9, 10, 11 and 12) carried a notice of prior conviction specification.  *Id.*  On February 12, 2016, Zimmer pleaded not guilty to the indictment.  Doc. 6-1, p. 17.

On June 28, 2016, Zimmer waived his right to a jury trial and his case proceeded to a bench trial.  Doc. 6-1, pp. 18-20.  On July 1, 2016, the trial court found Zimmer guilty of all counts except one count of rape (Count 5) and continued the matter for consideration of the sexually violent predator specifications and repeat violent offender specifications.  Doc. 6-1, p. 21.  On July 13, 2016, Zimmer filed a motion to dismiss the repeat violent offender specifications.  Doc. 6-1, pp. 22-25.  The State opposed the motion.  Doc. 6-1, pp. 26-32.

Following a hearing, on July 14, 2016, the trial court dismissed the repeat violent offender specifications, finding them not properly pled.  Doc. 6-1, p. 33.  Also, the trial court acquitted Zimmer of the sexually violent predator specifications, finding that it was not proven beyond a reasonable doubt that Zimmer was a sexually violent predator.  *Id.*

On July 28, 2016, Zimmer filed a pro se motion for new trial.  Doc. 6-1, pp. 34-37.  In his motion for a new trial, Zimmer argued that his attorney had not called a key witness (Melissa) to testify.  *Id.*  On August 2, 2016, the trial court denied Zimmer's motion for a new trial.  Doc. 6-1, p. 38.

On August 18, 2016,[2] the trial court sentenced Zimmer to life in prison for the two counts of rape of a child under age 13; ten years in prison for each of the three counts of forcible rape; ten years in prison for the kidnapping associated with the GSI.  Doc. 6-1, pp. 39-40, 92-93.  The trial court merged the other kidnapping convictions into the associated rape convictions; merged the gross sexual imposition into the associated kidnapping conviction; and ordered all the sentences to be served concurrently.  Doc. 6-1, pp. 92-93.

## B.    Direct appeal

On September 14, 2016, Zimmer, through new counsel, filed a Notice of Appeal (Case No CA 16 104946).  Doc. 6-1, pp. 41-50.  On December 16, 2016, Zimmer's appellate brief was filed.  Doc. 6-1, pp. 51-67.  He raised the following assignments of error:

1.  The trial court erred in denying defendant-appellant's motion for acquittal pursuant to Ohio Criminal Rule 29.

2.  Defendant-appellant's convictions are against the manifest weight of the evidence.

---

[2] The journal entry was received for filing on August 23, 2016.  Doc. 6-1, pp. 39-40.

Doc. 6-1, pp. 55, 62-66.  The State filed its brief on February 13, 2017.  Doc. 6-1, pp. 68-89.  On

June 22, 2017, the Eighth District Court of Appeals affirmed the judgment of the trial court.

Doc. 6-1, pp. 90-108.   Zimmer did not file an appeal with the Supreme Court of Ohio.

**C.    Application for Reopening pursuant to App. R. 26(B)**

On September 21, 2017, Zimmer filed a pro se Application for Reopening his appeal

pursuant to Ohio App. R. 26(B).  Doc. 6-1, pp. 109-118.   In seeking to reopen his appeal,

Zimmer argued that, due to his appellate counsel's ineffectiveness, the following assignments of

error were not considered on appeal:

1.  The trial court erred in denying defendant-petitioner's motion for a new trial.

2.  Failure to raise ineffective assistance of trial counsel.

3.  Ineffective assistance of appeal counsel.

Doc. 6-1, pp. 111-115.  On October 23, 2017, the State filed an opposition to Zimmer's request

to reopen his appeal.  Doc. 6-1, pp. 111-125.  On October 23, 2017, the state court of appeals

denied Zimmer's application to reopen on the basis that the application was untimely and

Zimmer failed to proffer any explanation to show good cause for the late filing.  Doc. 6-1, pp.

126-130.  On November 29, 2017, Zimmer filed a pro motion requesting that the state court of

appeals reconsider his application to reopen.  Doc. 6-1, pp. 131-143.  Zimmer argued that his

application was denied on the basis of being one day late and that said filing should have been

deemed timely filed because the certificate of service reflects that he mailed the application five

days before the deadline for its filing.  Doc. 6-1, p. 131.  On December 12, 2017, the state court

of appeals denied Zimmer's motion to reconsider his application to reopen.  Doc. 6-1, p. 144.

Zimmer did not file an appeal with the Supreme Court of Ohio.

**D.     Motion for New Trial**

On May 21, 2018, Zimmer filed a pro se motion for new trial with the trial court pursuant to Ohio Crim. R. 33.  Doc. 6-1, pp. 145-151.  Zimmer argued that a new trial should be granted because his trial counsel did not call several witnesses who would have provided exculpatory testimony; trial counsel would not allow Zimmer to take the stand; trial counsel denied Zimmer's demand for a jury trial and pressured him into having a bench trial; and there was new evidence of an alibi and to show that Zimmer could not have committed the offenses.  Doc. 6-1, pp. 147-149.  On May 23, 2018, the trial court denied Zimmer's motion for new trial.  Doc. 6-1, p. 152.

**E.     Notice of Appeal/Motion for Leave to File Delayed Appeal**

On October 22, 2018, Zimmer filed a pro se notice of appeal (Doc. 6-1, pp. 153-155) and motion for leave to file a delayed appeal (Doc. 6-1, pp. 156-179) with the Supreme Court of Ohio.  Zimmer sought to appeal the state court of appeals' June 22, 2017, decision affirming his convictions and sentences.  Doc. 6-1, p. 157.  Zimmer stated he had been unable to file a timely appeal because of conditions at the prison library, e.g., librarian at prison library quit, lack of available word processors/typewriters; lack of the required forms at the law library.  Doc. 6-1, pp. 157-158.  Zimmer also indicated he lacked legal expertise and had no resources to hire his own attorney.  Doc. 6-1, pp. 157-158.  On December 12, 2018, the Ohio Supreme Court denied Zimmer's motion for a delayed appeal.  Doc. 6-1, p. 180.

**F.     Other trial court motions**

On December 28, 2018, Zimmer filed a pro se motion in the trial court to stay court costs. Doc. 6-1, pp. 181-183.  The trial court denied the motion on January 4, 2019.  Doc. 6-1, p. 184.

On May 13, 2019, Zimmer filed a pro se motion requesting discovery and arrest warrant under Crim. R. 16.  Doc. 6-1, p. 185.  On July 8, 2019, the state opposed the motion.  Doc. 6-1, pp. 186-190.  As of Respondent's filing of his Answer, the motion for discovery remained pending.  Doc. 6, p. 11, n. 1.

## G.    Federal Habeas Corpus

Zimmer raises the following four grounds for relief in his Petition:

**Ground One**:  Ineffective Assistance of Trial Counsel.

Supporting Facts: Trial counsel refused to call exculpatory witnesses, Trial Counsel denied Petitioner's right to testify, Trial Counsel refused Petitioner's demands for a jury trial. All violated Petitioner's Constitutional right's, the right to "Effective" Assistance of Counsel, right to a fair trial, and right to due process and equal protection of the law, which Prejudiced Petitioner's defense.

**Ground Two**:  Ineffective Assistance of Appellate Counsel

Supporting Facts:  Appellate Counsel failed to consult with Petitioner, and failed to raise Ineffective Assistance of Trial Counsel.

**Ground Three**:  Insufficient Evidence.

Supporting Facts:  Petitioner's convictions were not supported by Sufficient Evidence, and the Trial Court erred by failing to acquit on all charges. There is NO Sufficient Evidence in this case.  Which prejudiced Petitioner's case.

**Ground Four**:  Convictions are Against the Manifest Weight of the Evidence.

Supporting Facts:  The court's abused its discretion by making a finding against the manifest weight of the evidence, which Prejudiced Petitioner's case.

Doc. 1, pp. 7-10, 20-31.

## III.    Law and Analysis

## A.    Standard of Review under AEDPA

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104-132, 110 Stat. 1214 ("AEDPA"), apply to petitions filed after the effective date of the

AEDPA.  *Stewart v. Erwin*, 503 F.3d 488, 493 (6th Cir. 2007).  In particular, the controlling

AEDPA provision states:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  "A decision is 'contrary to' clearly established federal law when 'the state

court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law

or decides a case differently than the Supreme Court has on a set of materially indistinguishable

facts.'"  *Otte v. Houk*, 654 F.3d 594, 599 (6th Cir. 2011) (quoting *Williams v. Taylor*, 529 U.S.

362, 412-13 (2000)).  "A state court's adjudication only results in an 'unreasonable application'

of clearly established federal law when 'the state court identifies the correct governing legal

principle from the Supreme Court's decisions but unreasonably applies that principle to the facts

of the prisoner's case.'"  *Id.* at 599-600 (quoting *Williams*, 529 U.S. at 413).  "The 'unreasonable

application' clause requires the state court decision to be more than incorrect or erroneous."

*Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).  "The state court's application of clearly established

law must be objectively unreasonable."  *Id.*

In order to obtain federal habeas corpus relief, a petitioner must establish that the state

court's decision "was so lacking in justification that there was an error well understood and

comprehended in existing law beyond any possibility for fairminded disagreement."  *Bobby v.*

*Dixon*, 132 S. Ct. 26, 27 (2011) (quoting *Harrington v. Richter*, 131 S. Ct. 770, 786–87 (2011).

This bar is "difficult to meet" because "habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Richter*, 131 S. Ct. at 786 (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring in judgment)).  In short, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Id*. (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  The petitioner carries the burden of proof. *Cullen v. Pinholster*, 131 S.Ct. 1388, 1398 (2011).

**B.**  **AEDPA Statute of Limitations**

28 U.S.C. § 2244 limits the time within which a person in custody pursuant to the judgment of a state court may file a petition for a federal writ of habeas corpus, providing in relevant part:

(d)(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation shall run from the latest of --

> (A)  the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

> (B)  the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

> (C)  the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

> (D)  the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d).  The statute of limitations is tolled for any period of time in which a properly filed petition for post-conviction or other collateral review is pending before the state courts.  *Jurado v. Burt,* 337 F.3d 638, 640 (6th Cir. 2003).  "[A]n application is pending so long as the ordinary state collateral review process is 'in continuance.'"  *Carey v. Saffold*, 536 U.S. 214, 219-220 (2002); *see also Applegarth v. Warden North Cent. Correctional Inst.*, 377 Fed. Appx. 448, 449-450 (6th Cir. 2010) (relying on *Carey* when concluding that, where an appeal was not taken to the Ohio Supreme Court from the denial of a Rule 5(A) motion for delayed appeal, AEDPA was not tolled beyond the 45-day period in which the petitioner had to file an appeal).  This statutory tolling provision, however, does not "revive the limitations period (i.e., restart the clock at zero); it can only serve to pause a clock that has not yet fully run.  Once the limitations period is expired, collateral petitions can no longer serve to avoid a statute of limitations."  *Vroman v. Brigano,* 346 F.3d 598, 602 (6th Cir. 2003) (internal quotations and citation omitted).

Respondent argues that Zimmer's Petition should be dismissed because it was filed beyond the statute of limitations.[3]  For the reasons discussed herein, the undersigned agrees.[4]

### 1.    Zimmer's Petition is untimely under 28 U.S.C. § 2244(d)(1)(A)

On August 18, 2016, the trial court sentenced Zimmer.[5]  Doc. 6-1, pp. 39-40.  Zimmer timely filed an appeal with the Eighth District Court of Appeals and, on June 22, 2017, the state court of appeals affirmed Zimmer's convictions and sentences.  Doc. 6-1, pp. 90-108.  Zimmer

---

[3] Respondent alternatively argues that dismissal of Ground Four is warranted because a manifest weight of the evidence claim is not cognizable on federal habeas review.   Doc. 6, p. 13.

[4] There are minor differences between the undersigned's and the Respondent's calculations but the conclusion remains the same, i.e., the Petition is time barred.

[5] The journal entry was docketed on August 23, 2016.  Doc. 6-1, pp. 39-40.

had 45 days from June 22, 2017, or until August 6, 2017, to appeal the Ohio Court of Appeals'
judgment to the Ohio Supreme Court.  *See* S.Ct.Prac.R. 7.01(A)(1)(a)(i).  The forty-fifth day –
August 6, 2017 – was a Sunday.  Thus, Zimmer would have had until August 7, 2017, to file his
appeal.  *See* S.Ct.Prac.R. 3.03(A)(1).  Zimmer did not file an appeal within that time period.

Under 28 U.S.C. § 2244(d)(1)(A), Zimmer's one-year statute of limitations began to run
when "the judgment became final by the conclusion of direct review or the expiration of the time
for seeking such review." *See* 28 U.S.C. § 2244(d)(1)(A).[6]  Zimmer seeks to calculate the one-
year period for filing a federal habeas petition from December 12, 2018, the date the Supreme
Court of Ohio denied his motion for delayed appeal.  Doc. 7, p. 2; Doc. 6-1, p. 180.  He contends
that his Petition was therefore timely.  *Id.*  However, "a motion for a delayed appeal is an
application for collateral review or postconviction relief[]" and not considered part of the direct
review.  *Foster v. Bobby*, 2010 WL 1524484, * 3-4 (N.D. Ohio Apr. 15, 2011).  Therefore,
Zimmer's judgment became final on August 7, 2017 – at the expiration of the 45-day period that
Zimmer had for filing an appeal with the Supreme Court of Ohio from the state court of appeals'
June 22, 2017, judgment affirming his convictions and sentences.  And the statute of limitations
began running the next day, i.e., August 8, 2017; Zimmer had one year from that date or until
August 8, 2018, to file his federal habeas petition.

As indicated herein, Zimmer's Petition is deemed filed on June 11, 2019.[7]  Thus, he filed
his Petition more than one year after the expiration of the statute of limitations.  Accordingly,
absent tolling of the statute of limitations, his Petition is time-barred.

---

[6] Zimmer does not argue that the statute of limitations should be analyzed under any other subsection of 28 U.S.C. §
2244(d)(1) nor is it apparent from the record that any other subsection would apply.

[7] Under the prison mailbox rule, Zimmer's Petition is deemed filed on June 11, 2019.  *See* FN 1 above.

During the running of the above noted statute of limitations, Zimmer filed various motions for collateral review.  As discussed below, while certain motions tolled the statute of limitations,[8] Zimmer's Petition was nonetheless not filed timely.

On September 21, 2017, Zimmer filed an application to reopen his appeal.  Doc.  6-1, pp. 109-118.  Thus, up to, but not including September 21, 2017, the statute of limitations had run for 44 days.  The state court of appeals denied the application on October 23, 2017.  Doc. 6-1, pp. 126-130.  Zimmer did not file an appeal from that decision but he filed a motion for reconsideration on November 29, 2017.  Doc. 6-1, pp. 131-143.  The state court of appeals denied the motion for reconsideration on December 12, 2017.  Doc. 6-1, p. 144.  Zimmer would have had until January 26, 2018, to file an appeal from the denial of the motion for reconsideration but did not file one.   Assuming arguendo that the application to reopen appeal was "properly filed,"[9] and assuming arguendo that the statute of limitations remained tolled during the pendency of the application to reopen and during the pendency of the motion for reconsideration,[10] including a 45-day period to file an appeal from the denial of the motion for reconsideration, the statute of limitations would have resumed running on January 27, 2018.

---

[8] Zimmer's motion to stay court costs and motion for discovery did not seek review of the underlying judgment or claim and therefore are not considered in the tolling analysis below.  *See e.g., Wtikowski v. Vasbinder*, 2006 WL 618891, * 4 (E.D. Mich. Mar. 9, 2006) ("Not every filing by a criminal defendant meant to advance his challenge to a judgment of conviction amounts to an application for other collateral review of the judgment or claim."); *Branham v. Ignacio*, 83 F. Appx. 208, 209 (9th Cir. 2003) ("Statutory tolling applies while a 'properly filed application for State post-conviction or other collateral *review* with respect to the pertinent judgment or claim is pending.'") (quoting 28 U.S.C. § 2244(d)(2)) (emphasis in original); *Perry v. Birkett*, 2011 WL 2270896, * 4 (E.D. Mich. June 8, 2011) (motion for discovery did not toll AEDPA statute of limitations period) (citing *Hodge v. Greiner*, 269 F.3d 104, 107 (2nd Cir. 2001); *Smith v. Jones*, 2002 WL 31875516 (E.D. Mich. Nov. 26, 2002)); *Blue v. Medeiros*, 913 F.3d 1, 7 (2019) (motion to stay execution of sentence did not toll statute of limitations under AEDPA); *Westin v. Harris*, 2012 WL 2860511, * 4 (C.D. Cal. July 3, 2012) (finding that petitions challenging restitution orders did not toll the statute of limitations because they "were not filed 'with respect to the pertinent judgment or claim.'").

[9] The court of appeals denied the motion to reopen because it did not comply with the requirements of App. R. 26(B).  Doc. 6-1, p. 128.  Thus, the motion may not be a "properly filed application" under 28 U.S.C. § 2244(d)(2).

[10]  "There is some uncertainty as to whether a motion for reconsideration tolls the AEDPA statute of limitations."  *Garner v. Gansheimer*, 2010 WL 547482, at *5 (N.D. Ohio Feb. 10, 2010).

From January 27, 2018, until May 21, 2018, when Zimmer filed a motion for new trial, (Doc. 6-1, pp. 145-152), the statute of limitations ran for an additional 114 days.  Adding those days to the previous 44 days, as of the filing of his May 21, 2018, motion for new trial, 158 days of the one-year statute of limitations had run.  The trial court denied the motion for new trial on May 23, 2018.  Doc. 6-1, p. 152.  Zimmer had 30 days or, until June 22, 2018, to file an appeal with the court of appeals, *see* Ohio App. R. 4(A), but he did not do so.  Thus, the statute of limitations began to run again June 23, 2018, and continued to run until Zimmer filed his motion for leave to file a delayed appeal with the Ohio Supreme Court on October 22, 2018.  Doc. 6-1, p. 156.  From June 23, 2018, up to but not including, October 22, 2018, the statute of limitations ran for an additional 121 days.  Adding those days to the previous 158 days, a total of 279 days of the one-year statute of limitations had run.  The statute of limitations was tolled until December 12, 2018, the date the Supreme Court of Ohio denied Zimmer's motion for a delayed appeal and dismissed his appeal.  Doc. 6-1, p. 180.

Zimmer did not file a petition for certiorari with the Supreme Court of the United States.  Further, since a motion for delayed appeal is an application for collateral review or postconviction relief, Zimmer is not entitled to tolling under 28 U.S.C. § 2244(d)(2) for the 90-day period for seeking certiorari in the Supreme Court of the United States.  *See Foster*, 2010 WL 1524484, * 3-4 (discussing and relying on cases, including *Lawrence v. Florida*, 549 U.S. 327, 334 (2007) and *Searcy v. Carter*, 246 F.3d 515 (6th Cir. 2001)); *see also Kimble v. Gansheimer*, 2009 WL 4676959, * 6, n. 2 (N.D. Ohio Dec. 4, 2009) ("The 90 day period for seeking certiorari to the United States Supreme Court does not toll the AEDPA's statute of limitations under § 2244(d)(2).") (relying on *Lawrence*, 549 U.S. at 327).  Therefore, the statute of limitations resumed running on December 13, 2018.  At that time, 279 days of the one-year

statute of limitations had run.  Thus, Zimmer had 86 more days (365-279 days), or until March 9, 2019, to file his federal habeas petition timely.  March 9, 2019, fell on a Saturday.  Thus, Zimmer had until Monday, March 11, 2019, to file his Petition.  *See* Fed. R. Civ. P. 6(a)(1(C).  However, Zimmer did not file his Petition until June 11, 2019, three months after the one-year statute of limitations expired.  Doc. 1.  Accordingly, even taking into account statutory tolling, Zimmer's Petition is untimely under 28 U.S.C. § 2244(d).

### 2.  Zimmer is not entitled to equitable tolling of the statute of limitations

AEDPA's statute of limitations is subject to equitable tolling.  *Hall v. Warden, Lebanon Corr. Inst*., 662 F.3d 745, 749 (6th Cir. 2011) (citing *Holland v. Florida*, 560 U.S. 631, 130 S.Ct. 2549, 2560, 177 L.Ed.2d 130 (2010)).  Equitable tolling allows courts to review time-barred habeas petitions "provided that 'a litigant's failure to meet a legally-mandated deadline unavoidably arose from circumstances beyond that litigant's control.'"  *Robinson v. Easterling*, 424 Fed. Appx. 439, 442 (6th Cir. 2011) (quoting *Robertson v. Simpson*, 624 F.3d 781, 783 (6th Cir. 2010)).  There are two forms of equitable tolling: (1) *traditional* equitable tolling; and (2) *actual innocence* equitable tolling.  As discussed below, a petitioner, by satisfying the two-part test, may be entitled to traditional equitable tolling.  Additionally, a petitioner may be entitled to actual innocence equitable tolling.  However, for the reasons set forth below, Zimmer is entitled to neither form of equitable tolling.

### a.  Zimmer is not entitled to traditional equitable tolling

A habeas petitioner is entitled to equitable tolling only if (1) "he has been pursuing his rights diligently[;]" and (2) "that some extraordinary circumstance stood in his way and prevented timely filing."  *Hall*, 662 F.3d at 749 (quoting *Holland*, 130 S.Ct. at 2560).  Equitable tolling is "applied sparingly" and is evaluated on a case-by-case basis, with the petitioner

retaining the "ultimate burden of persuading the court that he or she is entitled to equitable tolling." *Ata v. Scutt,* 662 F.3d 736, 741 (6th Cir. 2011) (internal quotations and citations omitted).

Zimmer states in his Traverse he lacked: legal resources, notice of the filing requirements, and constructive knowledge of the filing requirements.  Doc. 7, p. 2.  Assuming that these statements are an argument by Zimmer that his untimely filing should be excused because he lacked legal assistance, he proceeded in state court without legal assistance when filing various motions.  Further, "*pro se* status and lack of knowledge of the law are not sufficient to constitute an extraordinary circumstance[.]"  *Keeling v. Warden, Lebanon Correctional Inst.*, 673 F.3d 452, 464 (6th Cir. 2012); *see also Hall*, 662 F.3d at 750-752 (lack of transcript, pro se status and limited law library access did not warrant equitable tolling); *Cobas v. Burgess*, 306 F.3d 441, 444 (6th Cir. 2002) ("[L]ack of legal training, [a petitioner's] poor education, or even [a petitioner's] illiteracy" are not reasons to toll the statute of limitations.).

Considering the foregoing, Zimmer has not demonstrated that extraordinary circumstances stood in the way of timely filing his habeas petition.  Furthermore, he does not specifically argue or demonstrate that he was diligently pursuing his rights.  For these reasons, Zimmer is not entitled to traditional equitable tolling of the statute of limitations under the *Holland* two-part test.

### b.  Zimmer is not entitled to actual innocence equitable tolling

In addition to equitable tolling under the traditional two-part test outlined above, "a petitioner may also be eligible for equitable tolling if he demonstrates actual innocence, so that by refusing to consider his petition due to timeliness the court would cause a fundamental miscarriage of justice."  *Patterson v. Lafler*, 455 Fed. Appx. 606, 609 (6th Cir. 2012).  "A valid

claim of actual innocence requires '*new* reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Id.* (quoting *Schlup v. Delo*, 513 U.S. 298, 324 (1995)) (emphasis supplied).  "The evidence must demonstrate factual innocence, not mere legal insufficiency." *Id.* (citing *Bousley v. United States*, 523 U.S. 614, 623 (1998)).

Zimmer has not argued or demonstrated that there is "new evidence," demonstrating his factual innocence.  Thus, Zimmer is not entitled to equitable tolling based on actual innocence.

## IV.    Conclusion and Recommendation

For the reasons set forth above, the undersigned concludes that Zimmer's Petition is untimely under 28 U.S.C. § 2244(d).  Further, Zimmer has not demonstrated an entitlement to equitable tolling of the statute of limitations.  Accordingly, the undersigned recommends that the Court **GRANT** Respondent's Motion to Dismiss (Doc. 6) and **DISMISS** Zimmer's Petition (Doc. 1) as barred by the statute of limitations.


May 15, 2020                                 */s/ Kathleen B. Burke*
                                              Kathleen B. Burke
                                              United States Magistrate Judge


## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); s*ee also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).